F I L E D

JUL 1 5 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DANIEL MOCK,                        )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )       1:13cv01292 (LMB/JFA)
                                    )
FEDERAL HOME LOAN MORTGAGE          )
    CORPORATION,                    )
                                    )
        Defendant.                  )

## MEMORANDUM OPINION

Plaintiff Daniel Mock ("plaintiff" or "Mock") brought this action against defendant Federal Home Loan Mortgage Corporation ("defendant" or "Freddie Mac") alleging violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. ("FLSA" or "Act"). The gravamen of Mock's Complaint is that his job duties as an Engineering Senior and Engineering Tech Lead (his job titles since 2010) were and are improperly and willfully classified as "exempt" under the FLSA. Mock seeks declaratory relief; an award of "unpaid overtime and unpaid regular time" under 28 U.S.C. §§ 207(a)(1) and 255; and an award of liquidated damages, attorney's fees, and costs under 29 U.S.C. § 216. Compl. Prayer For Relief.

Freddie Mac moved for summary judgment on all of Mock's claims, arguing that Mock's compensation and job duties render him exempt under the FLSA. Mock filed a response and oral

argument was held on Monday, July 7, 2014.  At the conclusion of the hearing, Freddie Mac's motion was granted.  This Memorandum Opinion provides further explanation for the decision.

## I.    FACTUAL BACKGROUND

Except where indicated, the following facts are not in dispute.  See [Am.] Mem. of Law in Supp. of  Def.'s Mot. for Summ. J. ("Mot.") at 2-11, Ex. A (Def.'s Statement of Undisputed Facts); Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Opp'n") at 4-15, 25-27.[1]

Mock is a full-time, salaried employee working in the Infrastructure Engineering Group ("IEG" or "Engineering Group") within Freddie Mac's Information Technology ("IT") Division. From at least 2010 until the present, Mock's base salary exceeded $100,000 per year, reflected as follows:

|      | Base Salary | Total Compensation (including bonuses) |
|------|-------------|-----------------------------------------|
| 2010 | $103,990    | $110,133                                |
| 2011 | $103,990    | $115,410                                |
| 2012 | $125,569    | $164,271                                |
| 2013 | $129,624    | $162,826                                |
| 2014 | $133,624    | N/A                                     |

---

[1] Because Mock's pleading is being considered only as an opposition to Freddie Mac's motion, and not a cross-motion for summary judgment, this summary of facts does not include facts pleaded in the section of Mock's Opposition entitled "Plaintiff's Statement of Undisputed Facts."  See Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Opp'n") at 31-38.

Mot. Ex. F[2] (Declaration of Linda Connolly) ("Connolly Decl.");

see also Opp'n at 4 ("The Plaintiff['] s salary during the effective time period of this action has been greater than $100,000."), 15 ("Plaintiff admits he is compensated in excess of $100,000 per year.").

The IEG was created by Subramaniam Kumar, Mock's second-line supervisor and then-Vice-President of Infrastructure Engineering, in January, 2010.  The IEG is one of two groups that manage Freddie Mac's IT infrastructure.  The other group is the Infrastructure Operations Team ("IOT" or "Operations Team").  Mock was chosen to be a member of the IEG at its creation given his aptitude and IT expertise, and in April, 2010, Mock's job title changed to "Engineering Senior."  In March, 2012, Mock was promoted to "Engineering Tech Lead."  Mock's counter-part on the IOT, Jeff Stewart, and all of the engineers in the IEG are all classified as "exempt" under the FLSA.  Mock and other members of the IEG perform non-manual office design work and develop computing solutions to meet Freddie Mac's business needs, including selecting appropriate technologies to utilize in addressing computing needs, developing automation scripts and

---

[2] Exhibits attached to Freddie Mac's motion are lettered "A" through "I," and exhibits attached to individual declarations (e.g., Exhibit B, Declaration of Jun Hu) are numbered (e.g., "B1," "B2," etc.).  Exhibits to Mock's Opposition are numbered 1 through 110.

processes to manage computing platforms, and providing their solutions to the IOT for implementation.

Mock is considered the subject matter expert and engineering lead for Freddie Mac's virtualization infrastructure and "VMware," an intricate software with various component products that allows for the installation and testing of software programs virtually without affecting actual computers, and which increases information technology storage capacity and space while decreasing the need for physical hardware. Approximately 75% of Freddie Mac's computer operating system is "virtualized."

Since 2012, Mock has also provided support for Freddie Mac's Out-of-Region Disaster Recovery Project in Denver, Colorado, although he denies being "a lead, stakeholder, or decision maker in the project." Opp'n at 7. In addition, Mock has enabled the United States Housing and Urban Development Agency ("HUD") to connect virtually to Freddie Mac's computer system; enabled the VMware Site Recovery Manager solution; enabled the Multifamily regional office to connect to Freddie Mac's system; enabled the VMware vCloud Solution to manage virtualization; developed a computer program to manage VMware OS provision and HP Blade provision; and introduced VMware technology into Freddie Mac's system from version 4.0 to 5.0 to 5.1, VMware View, vCloud, and VMware Site Recovery Manager.

The parties' accounts of the facts diverge when defining

the scope of Mock's job duties.  Relying on the testimony of

several witnesses,[3] Freddie Mac argues that Mock designs and

engineers VMware upgrades, by researching new versions of the

product, choosing new components, and upgrading the path for

existing components.[4]  Also according to Freddie Mac, Mock

performs cost/benefit analyses regarding new VMware software;

advises senior-level management about new software, including

potential purchases; and acts as a facilitator between

management and vendors concerning new products and technology.

For his part, Mock states that "[b]uilding, patching, and

maintaining servers to perform within vendor-prescribed

---

[3] Mock's opposition includes only one declaration by Mark Newton,
which Freddie Mac argues should be stricken under Fed. R. Civ.
P. 56(c)(4) because it does not identify Newton or how he
supposedly has personal knowledge about the facts asserted in
the declaration.  Def.'s Rebuttal Br. in Supp. of Mot. for Summ.
J. at 8 n.3.  During oral argument, Mock explained that Newton
is a colleague and that his job duties are similar to the job
duties Mock argues qualify him for an exemption under the FLSA.
A review of the declaration reveals that it adds nothing to the
parties' arguments and does not provide any evidence creating a
triable issue of fact.

[4] When new technology is purchased, Mock writes programming
scripts or has to configure the technology to fit into Freddie
Mac's computer operating system, which is complex.  To do so,
Mock tests the new technology in a "non-production" ("non-prod")
environment to see if it is compatible with Freddie Mac's
system; if not, Mock designs solutions and configures the
technology to fit into the system.  See Mot. Ex. I at 3-4
(Manager Evaluation and Updates for 2010) (detailing several
instances where Mock developed and implemented upgrades and
solutions for VMware).

parameters" is non-exempt work, and that he "has not recommended or selected new technologies for the Defendant's users"; rather, it is the branch of the IEG led by Jeffrey Owen that selects technologies, designs environments, and presents recommendations to senior-level management for approval. Opp'n at 5. Mock also states that he receives instructions from the IEG, which he then implements, and that the information he has provided senior-level management was merely digested from documentation provided by vendors. See, e.g., id. at 13 ("The Plaintiff did not perform any of the exempt duties of the FLSA. He simply received an order from management to install the application following the standards and procedures already documented by the operations teams."); 10 ("The vCloud Suite presentation did not involve any design, development, documentation, analysis, etc. The material was taken right out of the Vendor documentation.").

Other than Mock's statements, there is no evidence in the record to support his position. Moreover, Mock's minimization of the level of his work is directly contradicted by his own assessment of his accomplishments. For example, in his comments on his employee evaluation for 2010, Mock states, among many other things, that he "[d]eveloped, designed, automated, and implemented VMware BSC compliance against 90+ ESX hosts and 750+ Windows and Linux VMs . . . [d]eveloped and implemented automated VM provisioning for all supported versions of Windows

6

and Linux . . . [u]pgraded entire Dart infrastructure and application . . . [u]pgraded the entire VMware virtual infrastructure . . . [d]eveloped and deployed VMware build scripts . . . [and d]eveloped, designed, scripted, and implemented zero-day HP Blade System provisioning." Mot. at 20; Ex. I at 4 (Manager Evaluation and Updates for 2010); see also Ex. H at 5 (Manager Evaluation and Updates for 2011) (Mock describing that he "[u]pgraded virtual environment to vCenter v4.1 and 153 hosts to vSphere v4.1 . . . [c]reate[d] virtual presence in DMZ zones in HE2 and HE3 and expanded capacity in APP-ISO . . . [m]igrated 100+ TB of live vms off EOL storage arrays onto new storage without incident . . . [c]onverted all standard VMware networks to Virtual Distributed Switches . . . [c]onduct[ed] knowledge transfers to operational teams . . . [and] [t]roubleshooted virtual environments including crashed ESXi servers, datastore issues, network issues, etc.").

In 2011, Gregory Watchman, Freddie Mac's Managing Associate General Counsel for Employment Law & Employee Relations, reviewed Mock's job duties as an Engineering Senior in response to Mock and his counsel's complaint that Mock's job duties qualified as non-exempt under the FLSA. In the course of his review, Watchman spoke with Jun Hu, Mock's supervisor in the IEG. Watchman concluded that Mock's primary duties involved computer design work (exempt under FLSA Section 13(a)(17), the

7

Computer Professional Exemption) and that Mock likely qualified for the Highly Compensated Employee Exemption, as well.

Also in 2011, Freddie Mac engaged Towers Watson, a third-party consulting firm, to perform a review of Freddie Mac's classification of the Engineering Senior position as exempt. Towers Watson concluded that Mock's job duties, as well as the other Engineering Senior positions under Hu's supervision, fell within the Computer Professional and Highly Compensated Employee exemptions under the FLSA.[5]

In 2013, again in response to Mock's complaint that his job duties were non-exempt, Watchman undertook an extensive review of Mock's job duties, interviewing Hu, Kumar, and Tom Wiles, the director of the IOT. Watchman also met with Mock and allowed him to give his opinion as to why he thought his job duties should be reclassified as non-exempt. After these interviews, and after a review of Department of Labor regulations and other legal research, Watchman concluded that Mock's job duties fell within the Highly Compensated Employee Exemption under the FLSA and likely also fell within the Computer Professional and Administrative exemptions.

---

[5] The objectivity of this third party is established by its previous recommendation that Mock be reclassified from exempt to non-exempt when he held the job title of "System Administrator."

## II.    DISCUSSION

A. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Evans v. Techs. Applications & Serv., Co., 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). The party seeking summary judgment has the initial burden to show the absence of a material fact in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The party opposing summary judgment may not rest upon mere allegations or denials, and a "mere scintilla" of evidence is insufficient to overcome summary judgment. Anderson, 477 U.S. at 248-52. Unsupported speculation is not enough to withstand a motion for summary judgment. See Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Summary judgment is

9

appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." Brock v. Entre Computer Ctrs., 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

B. Analysis

Freddie Mac argues that Mock's job duties are exempt under the FLSA because he is a highly compensated employee and an administrative employee, as well as a computer professional. As discussed in open court and more fully developed below, each of these exemptions applies.

1. Highly Compensated Employee Exemption

"An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a). Although not dispositive, "[a] high level of compensation is a strong indicator of an employee's exempt

status, thus eliminating the need for a detailed analysis of the employee's job duties." Id. at § 541.601(c). The regulations define "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701. This includes "work normally and recurrently performed every workweek" but does not include "isolated or one-time tasks." Id.

The highly compensated employee exemption "applies only to employees whose primary duty includes performing office or non-manual work." 29 C.F.R. § 541.601(d).[6] An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Determining what an employee's primary duty is under that definition is fact-intensive and holistic. Id. "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent

---

[6] This does not include, for example, "non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving *repetitive operations with their hands, physical skill and energy*"; these types of employees "are not exempt under this section no matter how highly paid they might be." Id. at § 541.601(d).

performing exempt work; [7] the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

The parties do not dispute that Mock is a highly compensated employee who performs non-manual work. See Mot. at 14, Connolly Decl.; Opp'n at 4, 15. Rather, the parties' dispute centers on whether Mock's primary duties as a computer systems engineer fall within the administrative exemption.

### 2. Administrative Employee Exemption

An employee qualifies for the administrative exemption if (1) the employee is compensated on a salary or fee basis (as defined in the regulations) at a rate not less than $455 per

---

[7] The regulations provide that "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee" and "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). This is not dispositive, however, and "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." Id. For example, "assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register"; "[h]owever, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement." 29 C.F.R. § 541.700(c).

week; (2) the employee's primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200; see also Darveau v. Detecon, Inc., 515 F.3d 334, 338 (4th Cir. 2008).

FLSA "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). Accordingly, the employer bears the burden of proving by clear and convincing evidence that a particular employee's job duties fall within an exemption. Darveau, 515 F.3d at 337; Shockley v. City of Newport News, 997 F.2d 18, 21 (4th Cir. 1993). Further, whether a duty is administrative and whether an employee's duties, taken as a whole, exempt that employee from FLSA overtime requirements are both questions of law for the court. See Icicle Seafoods Inc. v. Worthington, 475 U.S. 709, 714 (1986); Shockley, 997 F.2d at 26. But the significance of duties relative to one another is a factual question. See Shockley, 997 F.2d at 26. Thus, a deviation from the 50 percent rule of thumb set forth in 29 C.F.R. § 541.700 "requires consideration of the factual circumstances for which a

13

jury is more appropriate." <u>Clark v. J.M. Benson Co., Inc.</u>, 789
F.2d 282, 286 n.2 (4th Cir. 1986).

### a. <u>Office or Non-Manual Work Directly Related to Management or General Business Operations</u>[8]

Under the regulations, work is "directly related to the
management or general business operations" if it is "directly
related to assisting with the running or servicing of the
business." 29 C.F.R. § 541.201(a). This includes "work in
functional areas such as . . . computer network, internet and
database administration." 29 C.F.R. § 541.201.

Freddie Mac argues that Mock is a white-collar employee who
advises senior management, makes plans on behalf of defendant
regarding software licenses, evaluates new technology purchases
and the allocation of technology resources, and represents
defendant in its relationships with vendors. Mot. at 16; Ex. B
(Declaration of Jun Hu) ("Hu Decl.") at ¶¶ 5 (stating that Mock
performs non-manual office design work and develops computing
solutions to meet defendant's business needs), 9 (stating that
Mock performs cost/benefit analyses with respect to new VMware
software, advises senior-level management about that software,
"is often the facilitator between management and vendors

---

[8] There is no dispute that Mock "is compensated on a salary or
fee basis (as defined in the regulations) at a rate not less
than $455 per week" and therefore the first requirement of the
Administrative Employee Exemption is satisfied.

concerning new products and technology," and advises management about potential purchases), 10-11; Hu Decl., Exs. B1 (e-mail exchanges between Mock, Kumar, and Jim Dalton, the Engineering Director in charge of the Denver, Colorado, data center project), B2 (copy of presentation Mock made to Community of Practicing ("CoP"), the "gatekeeper" of new technologies coming into Freddie Mac), B3 (same), B4 (copy of presentation Mock made to the Engineering Review Board ("ERB")).

Freddie Mac goes on to argue that Mock's role as the VMware subject matter expert, including his work designing and serving as lead engineer for the VMware platform for the Denver Disaster Recovery data center project, affects the management policies and business operations of Freddie Mac's IT infrastructure.  Id. In addition, Mock was responsible for allowing HUD to access Freddie Mac's computer system and continues to be the lead engineer for VMware configurations, designs, and upgrades.  Id. at 16-17; Hu Decl. at ¶¶ 7 (stating that Mock "has played a key role in the development, documentation, [i]ntegration, and design and testing of Freddie Mac's virtualization infrastructure"), 15 (stating that Mock's design for the HUD project . . . during 2011 was very important to Freddie Mac" and that Mock "worked with internal business partners and Legal, and designed and implemented the technical solution to allow HUD staff virtual access to certain confidential files of Freddie

Mac"; indeed, Mock's "work on this project was one of the reasons [Hu] recommended [Mock] for promotion to Engineering Tech Lead -- a promotion which he received in early 2012"); Hu Decl., Exs. B2, B5 (schematic); Ex. C (Declaration of Carl Thomas Wiles) ("Wiles Decl.") at ¶ 5 (describing a situation where virtual servers were not operating and Mock "was brought in to analyze the problem and figure out the root cause of the issue"; he was able to do so, "and provided the necessary data to the vendor to help it understand what was going on" and "[e]ventually, with Dan's help, the vendor was able to fix the problem").

In response, Mock argues his involvement with Freddie Mac's IT infrastructure is confined to maintaining "general computer operating software and hardware." Opp'n at 22 (citing Turner v. Human Genome Sci., Inc., 292 F. Supp. 2d 738, 745 (D. Md. 2003) (finding that plaintiffs did not qualify for the administration exemption because they "were simply the technicians who ke[pt] the company's overall computer and technological systems operating");[9] Martin v. Indiana Michigan Power Co., 381 F.3d 574, 581 (6th Cir. 2004) (concluding that "[m]aintaining [a] computer

---

[9] Unlike Mock, in Turner, the plaintiffs were "not members of a team whose job was to design, develop or implement any type of computerized information system," nor did they advise management, plan, negotiate, or represent the company in dealings with vendors. Turner, 292 F. Supp. 2d at 745.

system within [] predetermined parameters does not require

theoretical and practical application of highly-specialized

knowledge in computer systems analysis, programming, and

software engineering" such that an employee is a "systems

analyst" and thus qualified for the administrative exemption)).

Mock also disputes Freddie Mac's argument that his VMware

subject matter expertise qualifies as a "duty" under the FLSA,

and he argues that, in any event, under Freddie Mac's logic,

"the 'best' brake repairman at your local garage should be

exempt." Id. at 22-23. Mock minimizes his contributions to the

HUD solution, the Denver data center project, and the VMware

upgrades, which he asserts were all "led by others, designed by

others, developed by others, and performed by the Plaintiff

according to well documented policies and procedures." Id. at

23 (citing Exs. 12-15 (e-mails from Manish Bhonde to Mock and

others on various IT infrastructure topics), 22 (document

entitled "MF New Regional Offices – Engineering Artifacts"

naming Wei Xu as the "Author[]" of drafts, proposals, and a

framework and listing "Stakeholders and Contacts," a list that

does not include Mock), 23 (e-mail and PowerPoint presentation

for outreach meeting on the Disaster Recovery Program whose

agenda and "Key Stakeholder Engagement and POCs" do not include

Mock), 25 ("Project Charter & Scope" for Out-of-Region Disaster

Recovery Data Center listing five "Author[s]," none of whom is

17

Mock), 45 (e-mail between Subramaniam and Mock regarding HUD access)). Mock also argues that none of his presentations to the CoP or the ERB involved job duties that would qualify him for the administrative employee exemption. Id. at 29.

Mock's own evidence, Exhibit 65 submitted in support of his Opposition, contradicts his characterization of his job duties as they relate to the HUD project. In an e-mail chain between Gary Gerstman, the business lead on the project, Hu, T. Minh Tran, and Kumar, Gerstman wrote to "proactively offer some EPM feedback on Dan Mock":

> Our HUD Regulators demanded that we and Fannie Mae
> each build an envt (quickly) for them to access from
> their HUD offices to review highly confidential
> documentation and to analyze and test SAS data. We
> turned it around and implemented it in several weeks.
> I know there were BIO and Legal and other TS resources
> that helped to make this successful, but Dan was the
> one person who truly heard the need, designed the
> solution, built it, explained it to other TS
> resources, defined the necessary security groups, and
> then supported us through test, debug and Go Live, as
> well as post-Prod support. Fannie had a head start on
> us and we ended up delivering before they could. It
> seemed to me that Dan did much of this work for us in
> the middle of the night in addition to his regular
> work. He really went over and above to make this work
> for the company. So I wanted to make sure that I put
> in writing Legal's appreciation for the quality,
> volume and responsiveness of his expert support for us
> on this HUD project.

Opp'n Ex. 65.

Similarly, Exhibit 11 to Mock's Opposition, another e-mail chain, demonstrates that Mock provided advice to Kumar about the

18

purchase of VMware products for the disaster recovery data
center in Denver.  Opp'n Ex. 11.  And in Exhibit 26, an e-mail
from Dalton to Mock, Hu, and William Mitchell, Dalton asked Mock
for advice regarding a cost analysis comparing the use of
existing technology with alternative technology recommended by a
vendor.  Id. at Ex. 26.

The overwhelming weight of the evidence proffered by both
Freddie Mac and Mock demonstrates that Mock's non-manual job
duties are directly related to Freddie Mac's business operations
– specifically, the operation of its IT infrastructure.  There
is no dispute that 75% of Freddie Mac's IT infrastructure is
virtualized, and that Mock is the "go-to" subject matter expert
on the virtualization software, VMware.  There is also ample
evidence in the record to contradict Mock's somewhat conclusory
assertion that his involvement with Freddie Mac's IT
infrastructure is confined to simply maintaining software and
hardware.  The record is replete with instances where Mock
designed and implemented solutions and provided advice to upper-
level management, helping to shape Freddie Mac's purchasing
decisions and policies.  Mock also trained others, in one
instance presenting a two-hour "lunch-n-learn" "to demonstrate
features, capabilities, and benefits of the virtual
infrastructure."  Mot. Ex. H (Manager Evaluation and Updates for

19

2011).  All of this demonstrates that the second requirement for the administrative exemption has been met.

> b. <u>Exercise of Discretion and Independent Judgment With Respect to Matters of Significance</u>

Title 29, section 541.202(a) of the Code of Federal Regulations provides that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  The term "matters of significance" refers to the level of importance or consequence of the work performed.  <u>Id.</u>  As before, the inquiry here is fact-intensive, and

> [f]actors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: [1] whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; [2] whether the employee carries out major assignments in conducting the operations of the business; [3] whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; [4] whether the employee has authority to commit the employer in matters that have significant financial impact; [5] whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; [6] whether the employee provides consultation or expert advice to management; [7] whether the employee is involved in planning long- or short-term business objectives; [8] whether the employee investigates and resolves matters of significance on behalf of management; and [9] whether the employee represents

the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

"The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision"; "[h]owever, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). Accordingly, "the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." Id. Moreover, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." Id. Finally, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources"[10] and the term

---

[10] 29 C.F.R. § 541.704 provides that

[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section

"does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e).

Freddie Mac argues that Mock routinely provides IT support as an infrastructure engineer, and that he performs his job duties with a substantial amount of autonomy and discretion, deciding how to solve problems, how to handle assigned projects, and when to alert his supervisors about problems or situations. Mot. at 18; Wiles Decl. at ¶¶ 3, 4 (stating that Mock is the "go-to" person for VMware issues that the IOT is unable to solve, given his knowledge and experience with that software), 5-7 (citing examples where Mock assisted in identifying and solving various problems); Wiles Decl., Ex. C1 (e-mail from Mock to Wiles regarding server issue); Ex. D (Declaration of Manish Bhonde) ("Bhonde Decl.") at ¶¶ 8-9 (describing one responsibility of the IEG, "end-of-life technology," and stating that it is the engineers in the IEG, like Mock, who "com[e] up

---

13(a)(1) of the Act or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status. The section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.

with a solution to implement a newer version of the technology
into production," which is then provided to the IOT to help them
implement that solution).

In its reply, Freddie Mac focuses on one particular
instance where, it argues, Mock exercised significant discretion
and independent judgment.  Def.'s Rebuttal Br. in Supp. of Mot.
for Summ. J. at 6.  In his deposition testimony, Mock recounts
his efforts to rebuild the "non-prod" VMware clusters after they
went down sometime in 2011 or 2012.  Id.; Ex. G (Deposition of
Daniel Mock) ("Mock Dep.") at 18-22.  Mock received alerts that
there was a critical problem, alerted Hu and Wiles, and informed
them that he was headed to the data center to work on the
problem.  Id.

In opposition, Mock argues that troubleshooting computer
and computer-related systems is not the "exercise of discretion
and independent judgment with respect to matters of
significance"; rather, it is merely the application of "well-
established techniques, procedures or specific standards
described in manuals or other sources," and is, therefore,
outside the definition of that term under the relevant
regulations.  Opp'n at 23.  Mock also argues that the end-of-
life solution he purportedly created involved merely adding and
replacing servers, the same kind of work the IOT performs.  Id.
at 25.  Mock goes on to argue that "there has been no evidence

23

presented that shows that the Plaintiff provided any
documentation to the Operations Team to perform this task or
created any 'solutions' to perform this work."  Id. at 25-26.

As before, the record evidence demonstrates that Mock's
role as a systems engineer went well beyond "troubleshooting."
See, e.g., Hu Decl. at ¶ 20 ("[Mock] did not come to me and ask
if he could work on this task or that task, or tell me he was
going to spend a certain number of hours working to resolve a
problem.  We would discuss issues and consult about approaches
he was considering to take, but he made the decisions regarding
how to approach a problem and whether he would start working on
a problem at midnight or at 3 o'clock in the afternoon.").
Further, the use of manuals, directives, and prior instruction,
though they may "circumscribe" the exercise of discretion, are
not dispositive on the exemption question.  See Gilliam v.
Montgomery Ward & Co., Inc., 121 F.3d 698 (4th Cir. 1997) (table
decision) (finding that the impact of manuals and directives on
employee's discretion did not preclude a jury from finding in
favor of Montgomery Ward where evidence was in conflict) (citing
Donovan v. Burger King Corp., 675 F.2d 516, 521-22 (2d Cir.
1982) (rejecting Burger King managerial employee's contention
that his authority to act was severely limited by extensive
corporate regulations and standards that dictated to a large
extent how he managed the business)); see also Murray v.

24

Stuckey's, Inc., 50 F.3d 564, 569-70 (8th Cir. 1995) (rejecting argument that existence of company policies and guidelines for store manager circumscribed discretion so as to render him non-exempt).

Even if Mock were correct in arguing that he exercised no discretion or independent judgment as to the end-of-life server solution, there is no requirement that every job duty performed by an administrative employee involve the exercise of discretion or independent judgment. Rather, the test is whether Mock's primary duties involved the exercise of discretion or independent judgment. When all the evidence is considered, it is clear that Mock's primary duties as a systems engineer in the IEG involved evaluation, comparison, and application of his knowledge and experience free from immediate direction or supervision. See, e.g., Hu Decl. at ¶ 20 ("I did not oversee Dan's work in that way."). And, as demonstrated by the VMware cluster crash incident, Mock regularly took the initiative, informing higher-ups that a problem had been identified and he was attempting to fix it "under his own steam."

There is no dispute that Mock resisted his promotion from Systems Administrator to Engineering Senior and then Engineering Tech Lead, insisting on continuing to perform some work more appropriate for members of the operations team and refusing repeated requests to share knowledge and instruction with

others.  See Hu Decl. at ¶ 18 ("I told [Mock] on more than one
occasion that he needed to do a better job documenting his
processes so that people in operations could learn more about
the VMware platform.  For some reason, Dan resisted doing
this."); Wiles Decl. at ¶¶ 10-11 ("Even after the formation of
the engineering group in 2010, Dan continued to perform certain
duties that really should have been turned over to operations. .
. . In fact, on at least two occasions, I tried to have members
of my team take over certain duties that Dan continued to
perform; but it is my understanding that Dan was not cooperative
with those efforts.  Eventually, however, I was able to get Dan
to work with one of the members of my staff in terms of a
knowledge transfer of the remaining operations functions of the
VMware platform which Dan continued to perform."); Bhonde Decl.
at ¶¶ 11-12 ("I do not think [Mock] should have been doing
operations work.  He should have come to operations to do the
work or to our management. . . . Operations should be doing
operations work because if we do not do it, we will not learn
how to do it.  We will not get enough experience in working with
a product if Dan is taking on the work at night or on the
weekends.").

       Although he performs some non-exempt operations, the record
clearly establishes that as a matter of law, Mock customarily
and regularly performs non-manual work directly related to

Freddie Mac's IT infrastructure, and that he exercises discretion and independent judgment with regard to that infrastructure work, which the parties agree is a matter of significance to Freddie Mac.  Accordingly, Mock's job duties are exempt under the highly compensated and administrative employee exemptions to the FLSA.

### 3. Computer Professional Exemption

Mock also qualifies for the computer professional exemption.  This exemption only applies to computer employees whose primary duty consists of:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.400(b).

As discussed above, Mock admitted in his own evaluations of his work that his job duties include software development, design, automation, implementation, upgrading, and deployment. Although he attempted during oral argument to disclaim the accuracy of his self-evaluations as puffery, his managers and

supervisors' comments on those evaluations establish their accuracy. Additional evidence in the record demonstrates that Mock's design work includes theoretical and practical applications of his highly specialized knowledge of virtualization. See, e.g., Hu Decl. at ¶ 14 (stating that since 2010, Mock has performed various projects, including providing HUD access, managing virtualization, and "developing automation scripts to manage VMware OS provision and HP Blade provision"); Hu Decl. at Ex. B5 (schematic); Wiles Decl. at ¶ 10 (stating that "due to his specialized knowledge of the VMware infrastructure [Mock] was in charge of that platform for years, which included maintenance and support of the platform"); Bhonde Decl. at ¶¶ 5 (stating that Mock "designed the out-of-region DR solution for VMware, and he did the installation and configuration for the VMware environment"), 7 (stating that "[i]n addition to the out-of-region DR data center solution, [Mock] designed the multi-family regional office solution and designed a Citrix solution, which allowed [HUD] virtual access to our system"). Importantly, Mock not only designs software solutions, he tests them and then turns them over to the IOT. See Hu Decl. at ¶¶ 7, 13-16.

Mock responds that he does not have access to the code of any computer systems, programs, or machine operating systems. Opp'n at 24, Ex. 70 (excerpt of deposition where Hu testifies

that Mock did not write the VMware application, did not modify
the code that operates the application, and does not create
patches, fix the code, or write upgrades for the program).[11]
Mock also argues that he does not use system analysis techniques
and procedures to determine hardware, software, or system
functional specifications because the projects are already
designed or are using procedures that had already been designed.
Id.

Mock's argument appears to be that if he did not write the
code for the VMware software or create all of the systems he
analyzes, then he cannot be considered a "computer systems
analyst" as that term is defined in the regulations.  Mock's
narrow construction of the regulations is unpersuasive.

Although "designing," "developing," and "creating" computer
systems or programs are each sufficient for the exemption to
apply, so are the "application of systems analysis techniques
and procedures"; "documentation, analysis, creation, testing or
modification of computer systems or programs"; and
"documentation, testing, creation or modification of computer

_____

[11] Freddie Mac states that although Mock "did not write the code
VMware software program (employees at VMware did that), [Mock]
does design solutions to integrate the software and enable the
technology to work in Freddie Mac's unique operating systems."
Mot. at 20; see also Hu Decl. at ¶ 7 (stating that Mock "does
the design and engineering of VMware upgrades.  He researches
new versions of the product, chooses new components in the
infrastructure and upgrades the path for existing components.").

programs related to machine operating systems." <u>See</u> 29 C.F.R. §
541.400(b). Evidence in the record amply demonstrates that
although Mock did not create or write the VMware software used
by Freddie Mac, he upgrades the software, modifies it to adapt
it to Freddie Mac's complex operating systems, and tests
upgrades and modifications. <u>See</u> Bhonde Decl. at ¶ 9 ("Although
a vendor will provide documentation about an upgrade or new
technology, Freddie Mac has really complicated operating
systems, so the vendor's documentation may not work for our
systems. The upgrade or new technology has to be tested, most
likely in a non-production ('non-prod') environment and then
depending on the results, troubleshooting will occur and
engineering will need to design a solution to enable the
technology to work in Freddie Mac's environment."). This
necessarily requires both a high level of skill in systems
analysis and in-depth knowledge of both the software and Freddie
Mac's operating systems, and clearly establishes that Mock's
duties are exempt.

### III.     CONCLUSION

For the reasons stated in open court and in this Memorandum
Opinion, the Court has found that there is no material issue of
fact in dispute and that given the evidence in this record,
Freddie Mac has established by clear and convincing evidence
that Mock's job duties are exempt under the Highly Compensated

and Administrative Employee exemptions, as well as the Computer

Professional Exemption.   Therefore, summary judgment has been

granted in Freddie Mac's favor.[12]

   The Clerk is directed to forward copies of this Memorandum

Opinion to counsel of record and plaintiff <u>pro se</u> at his address

of record.

   Entered this 15 day of July, 2014.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

---

[12] To the extent Mock alleged that Freddie Mac willfully violated
the FLSA and also seeks compensation for unpaid "regular" time,
those claims are not discussed because they are moot given the
Court's finding that Freddie Mac has not violated the FLSA by
classifying Mock as exempt.